Nathan D. Thomas, UT #11965
Corey Hunter, USB #18964
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
NThomas@parsonsbehle.com
CHunter@parsonsbehle.com

Joseph T. Charron Jr. (*Pro Hac Vice Motion Forthcoming)*
BAKER & McKENZIE LLP
300 East Randolph St., Suite 5000
Chicago, Illinois 60601
Telephone: 312 861 8865
Facsimile: 415 576 3099
jt.charron@bakermckenzie.com

Phillip Di Tullio *(Pro Hac Vice Motion Forthcoming)*
BAKER & McKENZIE LLP
10250 Constellation Boulevard, Suite 1850
Los Angeles, CA 90067
Telephone:310 201 4728
Facsimile: 310 201 4721
phillip.ditullio@bakermckenzie.com

*Attorneys for Plaintiff, FLSmidth, Inc.*

---

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| FLSMIDTH, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM MALONE, an individual,<br><br>Defendant. | **COMPLAINT**<br><br>Case No. 2:26-cv-00762<br><br>District Judge ____________________<br><br>Magistrate Judge____________________ |

Plaintiff FLSmidth Inc. (hereinafter "FLS"), by and through its counsel, hereby files this Complaint against Defendant William Malone ("Malone") and alleges as follows:

## NATURE OF THE ACTION

1. FLS supports lawful and fair competition. But when an employee departs for a competitor and secretly steals valuable trade secrets, FLS protects its rights. These are the facts that give rise to this lawsuit against former FLS employee William Malone, who now serves as Product Manager – Crushers for North America at Weir Minerals U.S. Inc. ("Weir"), a competitor of FLS.

2. FLS is a global leader in the mining equipment industry, designing, manufacturing, and servicing technology used in mining and mineral processing operations worldwide. Among its core product offerings are crushing solutions—including gyratory, jaw, cone, roll, and other crushers—that are used to reduce and process mined rock and ore as part of the crushing and comminution process.

3. Malone worked for FLS for nearly 15 years, most recently as FLS' Global Product Line Manager – Crushing and Sizers. In that role, Malone was responsible for the worldwide management and strategic direction of FLS' crushing and screening business, including its portfolio of gyratory, jaw, cone, and other crushers used in mining and mineral processing operations around the world. His position covered a global remit, and he led the company's entire crushing portfolio. This gave Malone full and complete exposure on projects around the world, including, but not limited to, Chile, Peru, Australia, Kazakhstan, Uzbekistan, and the United States.

4. Throughout his employment with FLS, Malone was provided access to, and helped develop, FLS' confidential and trade secret information related to its crushers and crusher operations.

5. On or about April 10, 2026, Malone submitted his resignation notice to FLS because he was purportedly retiring. In reality, Malone secured a job with Weir—FLS' competitor—as its Product Manager, Crushers for North America in direct violation of his February 28, 2025 Employee Non-Disclosure, Invention, Non-Competition and Non-Solicitation Agreement (the "Non-Disclosure and Non-Competition Agreement") with FLS. (See Non-Disclosure and Non-Competition Agreement, attached as **Exhibit B**.)

6. In addition to lying about the reason he resigned, Malone also surreptitiously stole thousands of FLS documents containing FLS trade secret and confidential information by improperly downloading those documents onto removable storage devices in violation of the clear confidentiality provisions in the Non-Disclosure and Non-Competition Agreement. The information Malone stole included: confidential engineering drawings, FLS pricing and bid information for clients and projects, sensitive project cost and margin analysis, FLS' strategic growth plans, detailed information regarding FLS' suppliers and vendors, and other confidential operational data related to FLS projects.

7. The confidential and valuable FLS information that Malone stole was not publicly available or ascertainable through legitimate means. Rather, it comprised a comprehensive repository of FLS' crusher product portfolio, pricing, technical specifications, customer strategy, supplier relationships, and strategic growth plans—information that FLS spent years and substantial resources developing.

8. Through the acts alleged herein, Malone breached his contractual obligations not to work for an FLS competitor and committed both actual and threatened misappropriation FLS trade secrets and misuse of FLS confidential information.

9. The harm of Malone and Weir using the data Malone stole from FLS is immediate and continuing. Absent relief from this Court, FLS will suffer further irreparable harm. The FLS trade secrets and confidential information at issue comprise a wealth of specific and highly valuable knowledge relating to many aspects—past, current, and future—of FLS' business.

10. FLS brings this action to put a stop to Malone's breaches of his unambiguous noncompete and nondisclosure obligations under the Non-Disclosure and Non-Competition Agreement, as well as his threatened, actual, and ongoing misappropriation of FLS' confidential and trade secret information, and to prevent Malone from further benefitting from his theft of FLS' trade secret and confidential information.

11. FLS seeks damages and preliminary and permanent injunctive relief for Malone's violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq., the Utah Uniform Trade Secrets Act, Utah Code Ann. § 13-24-1 et seq., and his breaches of the nondisclosure, non-use, return-of-property, and noncompetition covenants in the Non-Disclosure and Non-Competition Agreement.

**PARTIES**

12. FLS is a Delaware corporation registered to do business in the State of Utah, with offices at 7158 S. FLSmidth Drive, Midvale, Utah, 84047.

13. Defendant William Malone is a former employee of FLS and resides in Sandy, Utah.

## JURISDICTION AND VENUE

14. This action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836 (the "DTSA"). Accordingly, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

15. This Court has supplemental jurisdiction over the remaining state and common law claims as such claims arise out of a common nucleus of operative facts as the DTSA claim.

16. This Court has personal jurisdiction over Malone because he is domiciled in the State of Utah.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).

## FACTS

18. FLS was founded in 1882 and has become a global provider of equipment and services to the mining industry. Part of the products and services FLS provides relates to a process known as crushing—which reduces large, raw rocks and extracted ore into smaller, manageable sizes.

19. Generally speaking, the crushing process uses various types of crushers: gyratory, jaw, cone, or roller. Ore is fed into a crusher—either in the mine itself, or in the minerals processing plant—and crushed using compression or impact to reduce the size of the rocks to something that is easier to transport, handle, and process.

20. FLS has spent billions of dollars developing its crushing business, which includes a wide array of crushers, crushing stations, and other equipment necessary to the crushing process. The specifications of FLS' technologies are proprietary trade secrets that are not known in the mining industry at large.

**Malone's Employment with FLS**

21. Malone first joined FLS in September 2011 as its Global Product Director – Crushing, was later promoted to Vice President Crushing & Screening.

22. In February 2025, FLS restructured its crusher business and changed Malone's job title to Global Product Line Manager – Crushers and Sizers. As FLS' Global Product Line Manager – Crushers and Sizers, Malone received a base salary of over $240,000 and his total annual target compensation was over $300,000.

23. In that role, Malone was responsible for the worldwide management and strategic direction of FLS' crushing and screening business, including its portfolio of gyratory, jaw, cone, and other crushers used in mining and mineral processing operations around the world. Malone's role with FLS was customer focused and involved product development (including introduction of new designs), marketing, and sales force development. His position covered a global remit, and he led the company's entire crushing portfolio. This gave Malone full and complete exposure on projects around the world, including, but not limited to, Chile, Peru, Australia, Kazakhstan, Uzbekistan, and the United States.

24. As FLS' Global Product Line Manager – Crushing and Sizers, Malone had access to and did access FLS' most sensitive, confidential, proprietary, and trade secret information related to FLS' crusher business and the sale and marketing of FLS' crusher products and services. As a senior executive, FLS entrusted Malone with FLS' proprietary, confidential, and trade secret information necessary to establish and grow FLS' crusher business.

25. At the time of his resignation, Malone was using FLS' trade secret and confidential information to service FLS customers globally.

**Malone's Employment Agreements**

26. In connection with his employment with FLS, Malone acknowledged and agreed to the terms of the Employment Agreement on or about December 5, 2022. (See Employment Agreement, attached as **Exhibit A**.) In connection with his February 2025 title change, Malone acknowledged and agreed to the terms and conditions of the Non-Disclosure and Non-Competition Agreement on or about February 28, 2025. (See Ex. B.).

27. Under the Non-Disclosure and Non-Competition Agreement, Malone agreed that, among other things, he would: (a) not disclose or misuse FLS Proprietary Information (as defined in the Non-Disclosure and Non-Competition Agreement); (b) promptly return all FLS property in his possession; (c) not solicit FLS customers or employees; and (d) not work for a Competing Business within the Restricted Territory for six months following the termination of his employment with FLS.

28. Nondisclosure. Malone agreed that during his employment with FLS and at all times thereafter, he would "hold in the strictest confidence and not disclose, use or publish any of the Proprietary Information" except when such disclosure was required in connection with the performance of his duties for FLS. (Ex. B at Section 3.)

29. Malone specifically acknowledged and agreed that the Proprietary Information to which FLS provided him access "derives value from the fact that it is not generally known and used by others in the highly competitive, international industry in which FLS competes." (Id. at Recitals.)

30. Malone's obligation not to use or disclose FLS Proprietary Information lasted "for so long as FLS and/or FLS Affiliates maintain the confidentiality of such information or such

information qualifies as a trade secret under the applicable Trade Secrets Act. (Id. at Section 3.)

31. Under the Non-Disclosure and Non-Competition Agreement, Proprietary Information is defined as:

> research and development, products, methodologies, financial information, business strategies, sales, sales volume, sales methods, sales proposals, agreements, customers and potential customers, identity of key purchasing personnel in the employ of customers and potential customers, amount and kind of customer purchases, customer and supplier lists and other confidential customer information regarding each customer's type of purchases, volume of business, pricing, personal data regarding each individual supplier/customer, information about the compensation, skills, abilities, training or qualifications of FLS and the FLS Affiliates' employees, sources of supply, business plans, proposals, technical secrets, technical data sheets, know-how and other information not generally known to the public and any tangible embodiments thereof including, but not limited to, drawings, prototypes, samples, computer software, computer hardware, designs, specifications, estimates, blueprints, plans, data, reports, processes, models, memoranda, notebooks, notes, sketches, artwork, letters, manuals, documents, photographs, motion pictures and any and all copies of all or portions thereof.

(Id. at Section 3.d.)

32. Malone also acknowledged his receipt of FLS policies and procedures, including FLS' policies and procedures regarding the nondisclosure of FLS confidential and trade secret information.

33. **Return of FLS Property.** Malone further agreed that, upon the termination of his employment with FLS for any reason, he would promptly return to FLS all originals and copies of FLS Proprietary Information and any and all other documents concerning FLS' business, Customers, and suppliers. (Id. at Section 3.e.)

34. **Non-Solicitation of Customers.** Malone expressly agreed that, during his employment and for six months thereafter, he would not solicit, attempt to obtain

business from, accept business from, service, provide consulting services to or contact an FLS Customer or Prospective Customer regarding any products or services similar to those provided by FLS. (Id. at Section 5.)

35. The Non-Disclosure and Non-Competition Agreement defines Customer to include "any person or entity that procured any products or services from FLS or the FLS Affiliates during the five (5) years preceding" Malone's termination. Prospective Customer is defined as "any person or entity that [Malone] or FLS or any FLS Affiliate solicited, contacted and/or communicated with for business purposes during the six (6) months preceding [Malone's] termination." (Id.at Section 5.)

36. **Non-Solicitation of Employees.** Malone also expressly agreed not to directly or indirectly solicit any FLS Employee to terminate his or her employment with FLS for six months following the end of his employment with FLS. (Id. at Section 6.)

37. Non-Competition. Malone further expressly agreed that, for a period of six months following the end of his employment with FLS, he would not work in any capacity for "any other person, corporation or other entity" that engages in a Competing Business in the Restricted Territory. (Id. at Section 7.)

38. The Non-Disclosure and Non-Competition Agreement defines Competing Business as:

> any person, business, enterprise or other entity which directly or indirectly sells or attempts to sell engineering services, equipment, and other products for the cement and mineral industries or any other products or services, or any combination thereof, which are the same as, or similar to the products and/or services sold or offered, at any time during the one (1) year preceding Employee's termination from employment, by: (i) FLS and/or (ii) the FLS Affiliates from which Employee received Proprietary Information.

(Id. at Section 7.b.)

39. Under the Non-Disclosure and Non-Competition Agreement, Restricted Territory is defined to be:

> the continents of North and South America and the fifty (50) mile radius of any other geographic location where FLS' products or services are sold, provided, offered for sale or planned to be offered for sale at any time during the preceding two-year period. Employee acknowledges that the Restricted Territory is reasonable because FLS and/or the FLS Affiliates from which Employee has received Proprietary Information offer their products and services and/or plan to offer their products and services throughout this geographic market.

(Id. at Section 7.c.)

40. Malone agreed that, in the event he violated his noncompete obligations, the six-month noncompete period "will be extended by that number of days which equals the aggregate of all days during which at any time such violations occurred. (Id. at Section 10.)

41. Malone acknowledged and agreed that these restrictions were necessary to protect FLS' legitimate business and protectible business interests in its customers, prospective customers, confidential, proprietary and trade secret information, and goodwill. (See **Ex.** B, Recitals, Section 2.)

42. In addition to all other remedies at law and equity, Malone agreed that any breach of the above-referenced provisions of the Non-Disclosure and Non-Competition Agreement would result in immediate and irreparable harm to FLS, and that FLS would be entitled to equitable relief in the form of an injunction in the event of his breach of his contractual obligations to FLS. (Id. at Sections 2, 11.)

43. Malone further expressly agreed that FLS is entitled to recover its "attorneys' fees and expenses and costs of suit" in the event he breached his contractual obligations to FLS. (Id. at Section 11.)

**FLS Goes to Great Lengths to Protect its Confidential and Trade Secret Information**

44. FLS confidential and trade secret information includes, but is not limited to, the following:

a. Protected customer information (customer lists, customer contact information, pricing, bids, quotes, opportunities, contacts, service agreement terms and expiration dates, contracts, preferences, equipment and system information, purchasing history, sales volume, frequencies/schedules, and reports);

b. Protected financial and operational information (operational strengths and weaknesses);

c. Protected inspection manuals, methods, testing procedures, reports, and quality and safety programs;

d. Protected contractor, supplier and vendor information (preferred vendor sources for parts and services, vendor purchasing histories, compilations of vendor pricing, rates, and services with relationship discounts, vendor lists containing contact information for key decision-makers, vendor preferences, contractor lists containing contact information, preferred contractors for certain geographic regions or customers, contractor pricing, rates, discounts, and mark-ups, and specialized services performed by contractors); and

e. Protected technical information related to the crusher products including engineering drawings and product specifications.

45. FLS expends significant time, effort, and expense in developing and maintaining its confidential and trade secret information, and FLS' financial success and ability to compete in the mining crusher market hinges on this information.

46. FLS considers the confidential and trade secret information described throughout this Complaint as highly sensitive proprietary and confidential trade secret information. This information is not readily available to the public, nor readily ascertainable from information in the public domain through legitimate means. Thus, FLS' confidential and trade secret information has independent economic value providing FLS with a competitive advantage in the market.

47. FLS will be unfairly and competitively disadvantaged if Malone, or any other employee, improperly uses or discloses this information.

48. FLS has therefore implemented measures to preserve and protect the confidentiality of its proprietary, confidential, and trade secret information, which include, among other things: (i) requiring employees to sign nondisclosure agreements (as is the case with Malone); (ii) implementing policies for protecting FLS proprietary information in the employee handbook; (iii) restricting access to certain information stored on FLS networks; (iv) implementing system security measures, including, without limitation, the use of passwords and system monitoring; (v) marking certain sensitive documents as confidential; and (vi) requiring vendors and customers to enter into non-disclosure and confidentiality agreements.

49. The success of FLS' crusher business is dependent, at least in part, on its proprietary, confidential, and trade secret information. If employees are allowed to take that information to compete with FLS in the marketplace, FLS will lose its ability to fairly compete.

**Malone Resigns His Employment with FLS and Breaches His Noncompete Obligations**

50. After nearly 15 years of employment with FLS, Malone abruptly submitted his resignation notice on April 10, 2026, advising FLS that his last day of employment would be

May 8, 2026. He told FLS that he was resigning because he wanted to retire. In reality, however, Malone had already secured a new job with Weir as its Product Manager – Crushers for North America—with responsibilities that are nearly identical to those he had during his employment with FLS.

51. FLS is informed and believes, and thereon alleges, that Malone accepted his employment with Weir on or about April 7, 2026.

52. Like FLS, Weir is a global supplier of mining equipment, technology, and services, including crushing, screening, comminution, and minerals processing equipment used by mining operations worldwide. Weir competes directly with FLS in the market for mining equipment and processing solutions, including the design, manufacture, sale, and servicing of crushing equipment and related technologies.

53. In addition to breaching his noncompete obligations under the Non-Disclosure and Non-Competition Agreement, Malone's work with Weir harms FLS by helping Weir—FLS' competitor—grow its crushing business and further develop products and services, including by using the FLS information he stole, that compete directly with those offered by FLS.

**Malone Misappropriates FLS' Confidential and Trade Secret Information**

54. In addition to breaching his noncompete obligations, Malone took critical FLS information prior to his resignation from FLS.

55. Specifically, unbeknownst to FLS at the time, Malone spent the weeks and months leading up to his resignation downloading thousands of documents containing FLS' confidential and trade secret information to removable storage devices.

56. The documents Malone misappropriated included, inter alia: (a) sensitive FLS commercial and bid data; (b) FLS cost and margin data for projects and equipment; (c) sensitive engineering drawings and technical specifications for FLS' products; (d) detailed information regarding FLS' vendors and suppliers; and (e) FLS' strategic growth plans.

57. Indeed, in the month of April alone—immediately before and after Malone accepted employment with Weir and resigned from FLS—Malone downloaded hundreds of FLS documents containing confidential and trade secret information.

58. Malone ceased working on April 24, 2026, and took paid leave for the final two weeks of his employment with FLS.

59. During his leave, Malone continued to download confidential and trade secret information to his removable storage devices despite knowing he would not be performing any further work for FLS and would soon be joining FLS' competitor—Weir.

60. The documents and information Malone misappropriated from FLS serve no other purpose other than to assist Malone in his new position with Weir and enable him to improperly compete with FLS using FLS' confidential and trade secret information.

61. Once FLS learned of Malone's employment with Weir and misappropriation of FLS trade secret and confidential information, FLS through counsel by letters dated June 3 and June 19, 2026 demanded that Malone cease his employment with Weir, return the removable storage devices to which he downloaded FLS trade secrets and confidential information, provide his personal electronic devices to FLS for forensic examination, and fully abide by and honor his contractual and statutory obligations to FLS.

62. Although Malone agreed to, and has since, returned the removable storage devices to FLS, he refused to agree to the remaining demands in FLS' letters.

63. FLS' examination of Malone's devices is not yet complete, but an initial review of the information stored on those devices has revealed Malone downloaded additional documents containing FLS trade secret and confidential information to those devices of which FLS was not aware at the time it sent those letters.

64. Further, given Malone's refusal to turn over his computer and other devices to which he connected his removable storage devices, FLS is unable to determine the full extent of Malone's misappropriation.

65. Given Malone's blatant disregard for his contractual and legal obligations to FLS and misappropriation of FLS documents, it is inevitable that Malone will continue to improperly use FLS' confidential information to his benefit and that of Weir. Specifically, like FLS, Weir manufactures crushing equipment for the mining industry and offers products that compete with those offered by FLS.

66. Malone's brazen and unlawful acts alleged herein demonstrate that his conduct will continue absent court intervention. Malone's role and obligations to FLS underscore the irreparable harm FLS will suffer if Malone is not preliminarily and permanently enjoined from his unlawful conduct. Given the competitive nature of FLS' business, FLS' confidential and trade secret information constitutes an asset of enormous value and competitive advantage to FLS. The harm to FLS is imminent if Malone is allowed to continue his breach of his contractual and legal obligations to FLS and misappropriation of FLS trade secret and confidential information.

**COUNT I – MISAPPROPRIATION OF TRADE SECRETS**

**In Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.**

67. FLS incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

68. FLS owns and possesses unique and valuable information within the meaning of 18 U.S.C. § 1839(3), as alleged above.

69. Malone was a high-level executive with FLS, and responsible for FLS' crusher operations globally. In this role, Malone had access to, and did access, FLS' trade secret and confidential information.

70. This information was held in strict confidence by FLS and was only made available to Malone in his capacity as Global Product Line Manager – Crushing and Sizers. He was, and remains, under statutory and contractual obligations not to take, use, or disclose FLS' confidential or proprietary information, including all trade secrets.

71. Because its trade secrets and confidential information are invaluable to FLS' operations, it has implemented appropriate and reasonable protective measures to protect against the disclosure of its confidential and trade secret information. For example, FLS requires employees to sign confidentiality and nondisclosure agreements, implements system security measures, including the use of passwords and system monitoring, marks its trade secrets as confidential, and requires vendors and customers to sign nondisclosure and confidentiality agreements.

72. FLS also promulgates comprehensive confidential information protection and information security policies, which Malone was required to agree to and comply with during his employment with FLS.

73. Because of FLS' stringent security measures, FLS' trade secret information derives independent economic value by not being generally known or available to others in the mining industry to use through any legitimate means. FLS compiled the trade secret and confidential information over many years and at great expense.

74. Malone copied FLS' confidential and trade secret information to removable storage devices without permission from FLS, and without FLS' knowledge.

75. In violation of FLS' rights, Malone has misappropriated FLS' trade secret information in the improper and unlawful manner alleged herein.

76. Given Malone's employment with Weir in a substantially similar, if not identical, role to his position with FLS, Malone has or inevitably will use FLS' confidential and trade secret information for his benefit and that of Weir to unlawfully compete with FLS.

77. As a direct and proximate result of Malone's conduct, FLS has suffered, and if Malone's conduct is not stopped, will continue to suffer competitive harm, irreparable injury, and significant monetary damages in an amount to be proven at trial. Malone's conduct is affecting FLS' goodwill, reputation in the industry, and ability to compete in the highly competitive mining industry.

78. If Malone is not enjoined, he will continue to use FLS' trade secrets for his own benefit and to FLS' detriment. Because FLS' remedy at law is inadequate, FLS seeks, in addition

to monetary damages, injunctive relief to account for, recover, and protect its confidential trade secret information from further misuse and to protect its related legitimate business interests.

79. Malone's misappropriation of FLS' trade secret and confidential information was intentional, knowing, willful, malicious, fraudulent, and oppressive. FLS is therefore entitled to an award of exemplary damages and attorneys' fees.

**COUNT II – MISAPPROPRIATION OF TRADE SECRETS**

**In Violation of Utah Code Ann. § 13-24-1 et seq.**

80. FLS incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

81. FLS owns and possesses specific confidential trade secret information within the meaning of Utah Code Ann. § 13-24-2(4) as alleged herein.

82. As previously alleged herein, FLS has implemented reasonable protective measures to protect against the disclosure of its confidential trade secret information, which information Malone misappropriated by downloading to his personal removable storage devices without permission from FLS and without disclosure to FLS.

83. As a direct and proximate result of Malone's conduct, FLS has suffered, and if Malone's conduct is not stopped, will continue to suffer competitive harm, irreparable injury, and significant monetary damages in an amount to be proven at trial. Malone's conduct is affecting FLS' goodwill, reputation in the industry, and ability to compete in the highly competitive mining industry.

84. If Malone is not enjoined, he will continue to use FLS' trade secrets for his own benefit and to FLS' detriment. Because FLS' remedy at law is inadequate, FLS seeks, in addition

to monetary damages, injunctive relief to account for, recover, and protect its confidential trade secret information from further misuse and to protect its related legitimate business interests.

85. Malone's misappropriation of FLS' trade secret and confidential information was intentional, knowing, willful, malicious, fraudulent, and oppressive. FLS is therefore entitled to an award of exemplary damages and attorneys' fees.

## **COUNT III – BREACH OF CONTRACT**

86. FLS incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

87. The Non-Disclosure and Non-Competition Agreement is an enforceable agreement that imposes upon Malone certain contractual obligations, including the obligations: (a) not to disclose FLS confidential and trade secret information; (b) to return all FLS property and information to FLS upon termination; (c) not to solicit FLS customers or employees; and (d) not to work for a Competing Business during the six months following the termination of his employment. (Ex. B at Sections 3, 5-7.)

88. FLS fully performed and complied with all of its obligations under the Non-Disclosure and Non-Competition Agreement.

89. The terms of the Non-Disclosure and Non-Competition Agreement are reasonably necessary to protect FLS' legitimate business interests and are not a violation of any public policy. Indeed, Malone agreed that the "nondisclosure, nonsolicitation and other provisions hereof . . . have been established by FLS in order to protect its legitimate business interests." (Ex. B, at Section 2.)

90. Malone likewise acknowledged that the use or disclosure of the assets protected by the Non-Disclosure and Non-Competition Agreement "will cause irreparable and immediate harm to FLS, thus the restrictions contained in this Agreement are necessary for the protection of the business and goodwill of FLS." (Id.)

91. Malone has breached the Non-Disclosure and Non-Competition Agreement by improperly obtaining, using, and/or disclosing FLS' trade secret and confidential information, including in connection with his new employment with Weir.

92. Malone also breached the Non-Disclosure and Non-Competition Agreement by failing to return all FLS property to FLS upon his termination.

93. Malone further breached the Non-Disclosure and Non-Competition Agreement by commencing work for Weir, FLS' competitor, in a role that is substantially similar, if not identical, to the position he held with FLS.

94. Malone's breaches of the Non-Disclosure and Non-Competition Agreement have caused damage and harm to FLS including, without limitation, the losses incurred from Malone's misappropriation of FLS confidential and trade secret information in breach of his contractual obligations to FLS, and his competition with FLS by working for Weir in breach of his contractual obligations.

95. The full extent of Malone's breaches remains unknown, and the full amount of damages suffered by FLS is not presently ascertainable. In any event, monetary damages alone cannot adequately remedy the threatened and ongoing misuse of FLS' confidential and trade secret information.

96. Malone recognized this fact in his Non-Disclosure and Non-Competition Agreement when he agreed that “any breach of Sections 3, 5, 6 and 7 of this Agreement by Employee will result in immediate and irreparable harm to FLS and/or the FLS Affiliates, the amount of which will be extremely difficult to ascertain, and that FLS could not be reasonably or adequately compensated by damages in an action at law” (See Ex. B, Section 11.)

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff FLS respectfully requests that the Court enter a judgment in its favor and against Malone as follows:

A. Entering a preliminary and permanent injunction enjoining Malone from further disclosing or using any FLS trade secret information;

B. Ordering Malone to surrender all electronic devices in his possession, custody, or control—including any such devices used in connection with his employment with Weir—for inspection and forensic analysis and removal of all FLS trade secret and confidential information;

C. Entering a preliminary and permanent injunction enjoining Malone from working for Weir for the duration of his six-month noncompete period, to include the period in which Malone has been in breach of his noncompete obligations through the date such injunction is entered;

D. Entering judgment in favor of FLS finding that:

i. Malone misappropriated trade secrets in violation of the Defend Trade Secrets Act and the Utah Uniform Trade Secrets Act;

ii. Malone breached his nondisclosure obligations under the Non-Disclosure and Non-Competition Agreement;

iii. Malone breached his noncompete obligations under the Non-Disclosure and Non-Competition Agreement; and

iv. Malone breached his return of FLS property obligations under the Non-Disclosure and Non-Competition Agreement.

E. Awarding FLS all general, actual, and special damages, including exemplary, treble, and punitive damages that FLS has sustained and will sustain as a consequence of Malone's unlawful acts, all in an amount to be proven at trial;

F. Awarding FLS all reasonable costs incurred in prosecuting this action, including reasonable attorneys' fees;

G. Awarding FLS pre- and post-judgment interest; and

H. Awarding FLS such further relief as the Court considers just and proper.

DATED August 18, 2026.

*/s/Nathan D. Thomas*

Nathan D. Thomas
Corey Hunter
PARSONS BEHLE & LATIMER

*Attorneys for Plaintiff*